UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANDREW J. LYONS, *as Special Representative of* )
*the tort claim estate of Gary L. Lyons, deceased*, )
                                                   )
              *Plaintiff*, )
                                                   )
              v. )       No. 1:20-cv-01120-JMS-DLP
                                                   )
UNITED STATES, )
                                                   )
            *Defendant*. )

## ORDER

    Plaintiff Andrew Lyons brings this lawsuit as the Special Representative of the Estate of Gary Lyons against the United States related to the death of his father, Gary Lyons, following treatment at a Veterans Affairs Medical Center.[1]  The United States has filed a Motion for Summary Judgment, which is now ripe the Court's decision.  [Filing No. 71.]

### I.
### STANDARD OF REVIEW

    A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v.*

---

[1] The Court refers to Andrew Lyons as "Plaintiff" and to Gary Lyons as "Mr. Lyons" throughout this Order.

*Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.      Mr. Lyons' Initial Cancer Diagnosis

In November 2015, Mr. Lyons was referred by the Veterans Affairs Medical Center in Danville, Illinois ("Danville VA") to Dr. Norbert Welch, Jr. at Arnett Hospital in Lafayette, Indiana for treatment of a renal mass on his kidney that was discovered during a routine gall bladder removal surgery.  [Filing No. 76-1 at 5; Filing No. 76-1 at 67.]  Dr. Welch removed Mr. Lyons' cancerous kidney on January 20, 2016.  [Filing No. 76-1 at 12.]  Dr. Welch believed that he had removed all of the cancer because the fat margins at the site of the kidney removal surgery were all negative for signs of cancer.  [Filing No. 76-1 at 19-20.]

### B.      Mr. Lyons' Follow-Up Care, February 20, 2018 CT Scan, and March 13, 2018 CT Scan

Mr. Lyons wanted to do his surgery follow-up, including any future imaging, at a Veterans Affairs Medical Center – specifically, the Danville VA – because he was a United States Army Veteran, so his expenses were covered, and because it was convenient for him since he lived approximately twenty-five miles from the Danville VA in Veedersburg, Indiana.  [Filing No. 52 at 2; Filing No. 76-1 at 21-22.]  Mr. Lyons was not referred to an oncologist immediately after his kidney removal because there was no evidence of recurrent or metastatic disease.  [Filing No. 76-1 at 23-24.]  His post-kidney removal follow-up consisted of periodic chest x-rays, CT scans of

3

the kidney area, and lab tests ordered by Dr. Welch, but performed at the Danville VA. [Filing No. 76-1 at 24-27.] His chest x-rays were to take place every six months, for one to two years, then annually for five years. [Filing No. 76-1 at 24-25.] CT scans were to be performed at the six-month mark, the one and a half-year mark, and annually thereafter. [Filing No. 76-1 at 25-26.] Lab tests were to be performed every six months for five years. [Filing No. 76-1 at 26.]

On February 20, 2018, Mr. Lyons underwent a CT scan without contrast at the Danville VA. [Filing No. 76-1 at 40.] Dr. Welch reviewed the report from the CT scan and noted: "I do not identify any metastatic disease or nodal enlargement." [Filing No. 76-1 at 39-41.] Dr. Welch also reviewed the radiologist's report for the February 20, 2018 CT scan and informed Mr. Lyons of the findings at a March 5, 2018 appointment. [Filing No. 76-1 at 41-43.] Dr. Welch recommended that Mr. Lyons get a CT scan of his chest, based on a recent chest x-ray that showed a thickening of the mediastinum compared with previous chest x-rays, which is a potential area of metastatic spread. [Filing No. 76-1 at 42-43.]

On March 13, 2018, Mr. Lyons underwent a chest CT scan at the Danville VA. [Filing No. 76-1 at 74-75.] The report from the CT scan – signed by Dr. Charles Drocea, a radiologist – stated: "Impression: Groundglass opacity in the right upper lobe. Suggest follow-up examination in 3 months. Prior granulomatous disease." [Filing No. 76-1 at 75.] Dr. Welch believed the CT scan "looked good," and had his staff call Mr. Lyons to tell him that there were no masses observed. [Filing No. 76-1 at 48; Filing No. 76-1 at 53-54.] A follow-up visit was scheduled for January 30, 2019. [Filing No. 76-1 at 61.]

C.      **December 3, 2018 CT Scan and Discovery of Tumor**

On December 3, 2018, Mr. Lyons underwent a chest CT scan due to respiratory complaints.

[Filing No. 71-3 at 1.]  The CT scan revealed a 5 by 3.4 centimeter mass in the right hilum and a

mass in the right adrenal measuring 3 centimeters.  [Filing No. 71-3 at 1.]

D.      **The Disclosure of Adverse Events Policy**

The Danville VA had a "VHA Handbook" (the "Handbook"), which included a section

called "Disclosure of Adverse Events to Patients" (the "Adverse Events Policy").  The Adverse

Events Policy provided, in relevant part, as follows:

**2.      BACKGROUND**

> a.      VHA believes that there is an unwavering ethical obligation to
> disclose to patients harmful adverse events that have been sustained in the course
> of their [VA] care, including cases where the harm may not be obvious, or where
> there is a potential for harm to occur in the future.

*          *          *

**3.      DEFINITIONS**

> a.      **Adverse Event.**  Adverse events are untoward incidents, diagnostic
> or therapeutic misadventures, iatrogenic injuries, or other occurrences of harm or
> potential harm directly associated with care or services provided within the
> jurisdiction of the Veterans Healthcare System.

*          *          *

> d.      **Disclosure of Adverse Events.**  For the purpose of this Handbook,
> the phrase "disclosure of adverse events" refers to the forthright and empathetic
> discussion of clinically-significant facts between providers or other VHA personnel
> and patients or their personal representatives about the occurrence of a harmful
> adverse event, or an adverse event that could result in harm in the foreseeable
> future.  VA recognizes three types of adverse event disclosure[s].

*          *          *

> (2)      **Institutional Disclosure of Adverse Events.**  Institutional
> disclosure of adverse events (sometimes referred to as "administrative disclosure")
> is a formal process by which facility leader(s) together with clinicians and others,

5

as appropriate, inform the patient or the patient's personal representative that an adverse event has occurred during the patient's care that resulted in, or is reasonably expected to result in, death or serious injury, and provide specific information about the patient's rights and recourse….

*         *         *

## 8.    INSTITUTIONAL DISCLOSURE OF ADVERSE EVENTS

a.    Institutional disclosure of adverse events (sometimes referred to as "administrative disclosure") is a formal process by which facility leaders, together with clinicians and other appropriate individuals, inform the patient or the patient's personal representative that an adverse event has occurred during the patient's care that resulted in or is reasonably expected to result in death or serious injury. Serious injury may include significant or permanent disability, injury that leads to prolonged hospitalization, injury requiring life-sustaining intervention, or intervention to prevent impairment or damage…. Such adverse events require institutional disclosure regardless of whether they resulted from an error.

(1)    When an adverse event[] has resulted in or is reasonably expected to result in death or serious injury, an institutional disclosure must be performed regardless of when the event is discovered. This disclosure is required even if clinical disclosure has already occurred. If an initial clinical disclosure has been made, it is important to determine what role, if any, the treating clinician(s) will play in the institutional disclosure process, as well as in the ongoing care of the patient.

(2)    Institutional disclosure must be initiated as soon as reasonably possible and generally within 72 hours. This timeframe does not apply to adverse events that are only recognized after the associated episode of care…. Under such circumstances, if the adverse event has resulted in or is reasonably expected to result in death or serious injury, institutional disclosure is required, but disclosure may be delayed to allow for a thorough investigation of the facts provided.

b.    Institutional disclosure of adverse events needs to take place after organizational leaders (e.g., the Facility Director, Chief of Staff, Associate Director for Patient Care Services, members of the treatment team, and/or others as appropriate), have conferred with Regional Counsel and have determined what is to be communicated, by whom, and how.

c.    When initiating an institutional disclosure, institutional leaders invite the patient or personal representative to meet….

d.    Institutional disclosure[s] ideally need to be made face-to-face with the patient or the patient's personal representative, unless it is neither possible nor practical.

*            *            *

    f.     A request made in advance of the discussion by a patient or personal representative to bring an attorney must be honored, but may influence the choice of participants on behalf of the institution.

    g.     Institutional disclosure of adverse events must include:

    (1)     An expression of concern and an apology, including an explanation of the facts to the extent that they are known.

    (2)     An outline of treatment options, if appropriate.

    (3)     Arrangements for a second opinion, additional monitoring, expediting clinical consultations, bereavement support, or whatever might be appropriate depending on the circumstances and within the constraints of VA's statutory and regulatory authority.

    (4)     Contact information regarding designated staff who are to respond to questions regarding the disclosed information or clinical sequelae associated with the adverse event.

    (5)     Notification that the patient or personal representative has the option of obtaining outside medical or legal advice for further guidance.

    (6)     Offering information about potential compensation under 38 U.S.C. § 1151 and the Federal Tort Claims Act where the patient is a Veteran or under the Federal Tort Claims Act where the patient is a non-Veteran. This needs to include information about the procedures available to request compensation and where and how to obtain assistance in filing forms. Such information must be provided, even when not considered relevant, if requested by the patient or personal representative. <u>There should be no assurance that compensation will be granted, as the adverse event may not give rise to and meet legal criteria for compensation under 38 U.S.C. § 1151 and the Federal Tort Claims Act.</u>

[Filing No. 76-4 at 1-5 (emphasis in original).]

### E.    December 19, 2018 Meeting

On December 19, 2018, Mr. Lyons was called into a meeting at the Danville VA by Chief of Staff Dr. Dean Shoucair. [Filing No. 76-2 at 5-7.] Dr. Shoucair gave Mr. Lyons a document titled "Institutional Disclosure of Adverse Event" (the "Disclosure"). [Filing No. 76-2 at 16.] The Disclosure reflected those present at the December 19, 2018 meeting, which included Dr. Shoucair,

7

"Brooke Heckerson, HSS," "Dixie Enos, Risk Manager," and Mr. Lyons.  [Filing No. 76-2 at 16.]

The Disclosure stated:

> Discussion points on the adverse event:  Patient notified that the mass was missed on the March CT.
>
> Offer of assistance, including arrangements for a second opinion, additional monitoring, expediting clinical consultations, bereavement support:  Assistance offered, pt states does not need anything at this time.
>
> Questions addressed in the discussion:  Pt stated no questions at this time.
>
> Advisement about potential compensation through the Veterans Benefits Administration and the Federal Tort Claims Act:  Forms explained and provided to patient.
>
> Continued communication regarding the adverse event:  Explained to pt that he can contact VAIHCS with any questions.  Pt given Risk Manager[']s business card.

[Filing No. 76-2 at 16.]

> Dr. Shoucair explained the meeting further in his deposition:
>
> Q:  You don't give patients notice of an adverse event unless something bad has happened to them at the VA Hospital; do you?
>
> A:  Correct, right.  If there's an adverse event where something is missed, of course we have to disclose that.
>
> Q:  And so Gary Lyons had a CT scan in March of that year, there was a cancerous mass in his body, and that was missed by your people?
>
> A:  Missed by the reading radiologist, yes.
>
> Q:  At the VA Hospital?
>
> A:  Yes.
>
> Q:  Do you know who that was?
>
> A:  I believe that was Dr. Drocea.

*           *           *

Q:  Okay.  You, as chief of staff, have an obligation in the VA policy to meet with Gary Lyons to present this adverse event to him and tell him what his legal remedies are too; right?

A:  Absolutely, yes.

Q:  Yeah.  For example, you told him that he had a right to file a tort claim action against the hospital?

A:  So what I disclosed – I told him firstly what was that – the mass was missed. And Dixie, the RN, usually, at that point, hands over the tort legal documents, forms, that he could make – she explains the details of that.

                    *              *              *

Q:  Is the March 13, 2018, the CT that was missed that generated the disclosure of adverse event?

A:  Yes.  Yes.

Q:  In this December 3, 2018, radiology report, if you look at the bottom of page 1 of Exhibit 2, it talks about an abnormal mass; does it not?

A:  Yes.

Q:  Is that a cancerous mass?

                    *              *              *

A:  So masses – so masses, enlargements, growths, tumors, those are all terms that typically are used in medicine.  It doesn't connote whether it was cancerous or not cancerous.  You can have a mass, and it's –

Q:  Sure.  It could be benign or not cancerous.  I get that.  Thank you, sir.

A:  Okay.

Q:  Dr. Shoucair, do you know anything else about Mr. Lyons' treatment at the VA Hospital either before you met with him in 2018 or after you met with him in 2018? Do you have any information about his care with the VA?

A:  No, sir.

Q:  Okay.  Part of the institutional disclosure of an adverse event is an apology. Was that part of your meeting with… Mr. Lyons?

A:  Oh, yes.  I said, we are very sorry that this occurred. No excuse.  And he had my personal apology as well as on behalf of the director and the VA system.

[Filing No. 76-2 at 8-13.]

**F.      Subsequent Testing and Treatment**

Mr. Lyons underwent a pet CT scan on December 28, 2018, which showed multiple metastatic lesions in bones and mediastinal nodes in addition to the pulmonary and adrenal masses identified in the December 3, 2018 CT scan.  [Filing No. 71-3 at 1.]  A biopsy of the adrenal mass in January 2019 confirmed that the lesions were metastatic tumors from the primary renal cell carcinoma.  [Filing No. 71-3 at 1.]  Mr. Lyons sought treatment at the Richard L. Roudebush VA Medical Center in Indianapolis, Indiana (the "Indianapolis VA"), and began taking Pazopanib and "enjoyed an eight month response," but after the cancer progressed he began taking Nivolumab and "did not achieve a clinical response."  [Filing No. 13 at 3; Filing No. 71-3 at 1.]  On May 13, 2020, Mr. Lyons died as a result of a progression of metastatic renal cancer.  [Filing No. 71-3 at 1.]

**G.      The Lawsuit**

Mr. Lyons initiated this action by filing a Complaint in the United States District Court for the Northern District of Indiana on November 27, 2019.  [Filing No. 1.]  Shortly thereafter, the case was transferred to the United States District Court for the Central District of Illinois.  [Filing No. 7.]  On March 2, 2020, Mr. Lyons filed a Motion to Transfer in which he requested that the case be transferred to this District.  [Filing No. 13.]  The Motion to Transfer was granted, [Filing No. 16], Plaintiff was substituted for Mr. Lyons after Mr. Lyons' death, [Filing No. 36], and Plaintiff filed the operative Second Amended Complaint on April 23, 2021, [Filing No. 52].  In the Second Amended Complaint, Plaintiff alleges as follows:

> By the time [Mr.] Lyons was informed of [the missed cancerous mass] in December
> of 2018, cancer had begun to spread from the renal area to other organs, including
> his lungs and bones.  [Mr.] Lyons was informed, in part, that he could file a tort
> claim against the agency, due to the malpractice of missing the diagnosis and/or
> failing to inform him of the cancerous findings for approximately nine months.
>
> [Mr.] Lyons initiated a tort claim against the federal government within two (2)
> years, as required per 28 U.S.C. § 2401(b), based on the negligent provision of
> medical services at the Danville VA.  As one-hundred eighty (180) days have
> passed since that March 15, 2019 filing, [Mr.] Lyons exhausted his administrative
> remedies, and this lawsuit is timely filed.

[Filing No. 52 at 3.]

Plaintiff alleges a "negligence: loss of chance" claim against the United States under the

Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* ("FTCA"), and asserts that doctors at the

Danville VA "committed medical malpractice in failing to diagnose and/or failing to communicate

to [Mr.] Lyons, the medical fact of a metastatic nodule and a right hilar adenopathy that CT

scanning in February and March of 2018 clearly showed near his remaining kidney in the adrenal

area."  [Filing No. 52 at 3.]  Plaintiff alleges that as a direct and proximate result of the United

States' negligence, he: (1) "was seriously injured in that what was once a treatable but serious

medical condition grew and expanded throughout his body and became a fatal condition beyond

effective treatment"; (2) "suffered unnecessary pain and emotional suffering"; (3) "suffered an

irreversible loss of chance in fighting the cancer that…ravaged his body"; (4) "had a much shorter

life tha[n] he otherwise would have experienced"; and (5) "suffered an unnecessary loss of

enjoyment of life."  [Filing No. 52 at 3-4.]

### H.      Plaintiff's Expert Witness and the United States' Motion to Preclude

On April 13, 2021, Plaintiff disclosed to the United States that he would be using Dr. Luis

Villa, Jr., an oncologist, as an expert witness in this case and produced Dr. Villa's Expert Report,

curriculum vitae, and other relevant information.  [Filing No. 71-2.]  Plaintiff did not disclose any

other expert witnesses.  [Filing No. 71-2.]

> Dr. Villa states in his Expert Report as follows:
>
> I have received a report from doctor Robert D Tarver who is a board certified radiologist with his opinion regarding the sequential xray procedures performed by the treating physicians to follow up on Mr Lyons primary renal carcinoma. According to doctor Tarver there was a metastatic nodule that should have been reported in the interpretation of the February 20th 2018 abdominal CT scan and evidence of right hilar adenopathy in the chest X Ray of February the 20th 2018. [T]he March 2018 CT of the chest shows mediastinal adenopathy and a 4 by 3 centimeters right hilar mass.  By the time the December 2018 CT of the chest is performed the hilar mass already measures 5 by 3 centimeters, the mediastinal adenopathy has almost doubled and the right adrenal mass measures 3.9 centimeters.
>
> The failure to properly interpret radiologic procedures beginning February 2018 led to a delay in appropriate treatment for approximately 10 months.  During this time the disease progressed, the patient deteriorated clinically and Mr. Lyons changed from low risk to high-risk category according to the International Metastatic renal cell carcinoma database consortium criteria….  The median survival of patients with renal cell cancer treated with Pazopanib in multiple studies…is between 24 to 36 months yet Mr. Lyons achieved only an 8 month response and died 17 months later.
>
> In my opinion within reasonable medical probability it is reasonable to assume that had Mr Lyons been diagnosed and treated appropriately February or March 2018 he would have had a longer response to [Pazopanib] or similar tyrosine kinase inhibitor therapy and would have been in more favorable clinical status later on when immunotherapy (Nivolumab) became the optimal choice for second line treatment.

[Filing No. 71-3 at 1-2.]

On May 12, 2021, the United States filed a Motion to Preclude Expert Testimony in which

it requested that the Court enter an Order "precluding [Dr. Villa] from providing any testimony at

trial relating to radiology matters, including whether the radiological services provided by

Defendant in connection with the care of [Mr.] Lyons were negligent or failed to satisfy the

standard of care."  [Filing No. 56 at 2.]  After briefing by the parties, the Magistrate Judge granted

the Motion to Preclude and found that "Dr. Villa is prohibited from testifying at trial about whether the radiological services provided by Defendant in connection with the decedent's care were negligent or failed to satisfy the standard of care." [Filing No. 75 at 12.] The Magistrate Judge noted, however, that "[b]ecause Defendant does not challenge Dr. Villa's ability to testify regarding the effects of delayed treatment, Dr. Villa may still offer testimony on this topic." [Filing No. 75 at 12.]

### III.
### DISCUSSION

The United States' Motion for Summary Judgment is centered on the argument that because Plaintiff has not named a medical expert to testify regarding whether the standard of care was breached in connection with the March 2018 CT scan and whether any breach caused Mr. Lyons' death in May 2020, he cannot succeed on his negligence claim. The United States also argues that Indiana law applies to this case, that the Indiana Survival Act bars Plaintiff's claim, and that if Illinois law applies, Plaintiff's claim is barred because he did not comply with Ill. Comp. Stat. Ann. § 5/2-622, which required him to attach an affidavit and report to the Complaint providing certain details regarding his claims. The Court considers the choice of law issue first, and then addresses the United States' additional arguments.

### A.    Choice of Law

In support of its Motion for Summary Judgment, the United States argues that Illinois choice of law rules apply to this case, and that the Court should use the "most significant relationship" test to determine which state's substantive law applies, which requires considering the place where the injury occurred, the place where the conduct causing the injury occurred, the domicile or location of the parties, and the place where the relationship between the parties is centered. [Filing No. 73 at 10-11.] The United States argues that, under this framework, Indiana

13

law governs this dispute because Mr. Lyons lived in Indiana, his injuries were sustained in Indiana, the majority of his care related to his cancer occurred in Indiana, Plaintiff lives in Indiana, and the majority of Mr. Lyons' interactions with the United States occurred in Indiana because he sought treatment at the Indianapolis VA after the failure to diagnose.  [Filing No. 73 at 11.]  The United States contends that Plaintiff "has affirmed the centrality of Indiana to this action" by first filing the case in the Northern District of Indiana, then filing a motion to reconsider the decision to transfer the case to the Central District of Illinois and requesting transfer to this District instead, and then moving to transfer the case from the Central District of Illinois to this District.  [Filing No. 73 at 11-12.]

In his response, Plaintiff argues that the FTCA provides that the law of the place where the act or omission occurred applies to the merits of his claims (here, Illinois), and also that procedural matters are governed by federal law.  [Filing No. 76 at 12-13.]  He asserts that, in any event, the factors the United States focuses on in its choice of law analysis actually lead to the conclusion that Illinois law applies.  [Filing No. 76 at 13.]  Specifically, Plaintiff argues that the injury occurred in Illinois when the Danville VA "missed" the cancerous mass on the March 2018 CT scan, the place where the conduct occurred is Illinois, the place where the United States conducted its business is Illinois, and the place where the parties' relationship is centered is Illinois.  [Filing No. 76 at 13-14.]

The United States reiterates its arguments supporting the application of Indiana law in its reply.  [Filing No. 77 at 9-11.]

The FTCA provides that the United States is liable for money damages for personal injury caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his or her employment if a private person would be liable to the claimant

14

under the law of the place where the act or omission occurred.  28 U.S.C. § 1346(b)(1).  Tort law

of the state where the tort occurred applies when determining "whether the duty was breached and

whether the breach was the proximate cause of the plaintiff's injuries."  *Parrott v. United States*,

536 F.3d 629, 637 (7th Cir. 2008); *see also* 28 U.S.C. § 1346(b)(1).

The United States appears to interpret § 1346(b)(1) as dictating the application of the

choice of law rules of the state where the act or omission occurred, and not necessarily the

substantive law of that state.  But the United States does not point to any legal authority supporting

its interpretation, and the Court finds that § 1346(b)(1) requires that it apply the substantive law of

the place where the act complained of here – missing the cancerous mass on the March 13, 2018

CT scan – occurred.  That place is undisputedly Illinois and, accordingly, the Court will apply

Illinois law to Plaintiff's claims.[2]

## B.    Sufficiency of Expert Witness Evidence

The crux of the United States' Motion for Summary Judgment is that Plaintiff cannot meet

his burden of proving negligence or causation because he has not designated an expert witness

who will testify that Dr. Drocea, the radiologist who read the March 13, 2018 CT scan, deviated

from the applicable standard of care or that any deviation caused Mr. Lyons' death in May 2020.

[Filing No. 73 at 13-19.]

---

[2] The United States argues that Plaintiff did not comply with an Illinois statute, 735 Ill. Comp.
Stat. Ann. 5/2-622, because he failed to attach an affidavit and report to the Complaint addressing
whether the claims asserted are meritorious.  [Filing No. 73 at 12.]  It asserts that "[t]he fact that
Plaintiff did not attempt to comply with the mandatory procedural requirements of Illinois law
further undermines his argument for the application of Illinois law here."  [Filing No. 73 at 12.]
The Court rejects the notion that a failure to comply with § 5/2-622 factors into the choice-of-law
analysis and, in any event, whether or not Plaintiff failed to comply is not ultimately dispositive
of Plaintiff's claims as discussed below.

1. *Negligence*

The United States argues that "[t]his is a complex medical malpractice case involving allegations of negligence that cannot be readily understood by a layperson through the application of common knowledge." [Filing No. 73 at 14.] It notes that Dr. Villa, the only expert witness Plaintiff has disclosed, "repeatedly declined to venture an opinion on the content or significance of the February and March 2018 radiological images." [Filing No. 73 at 14.] The United States asserts that the Disclosure issued by the Danville VA is not an admission of negligence and that, even if it was, "the United States is not aware of any precedent that would make such an admission by the Danville VA binding on the United States such that Plaintiff would no longer have to introduce expert testimony satisfying his burden of proof on that question." [Filing No. 73 at 15-16.] The United States also argues that Plaintiff cannot rely on the report provided by Dr. Tarver – to which Dr. Villa refers in his Expert Report – to show that Dr. Drocea's reading of the CT scan deviated from the applicable standard of care. [Filing No. 73 at 16-17.]

Plaintiff responds that the United States admitted its negligence through the Disclosure, by acknowledging that Dr. Drocea "missed a mass" that was visible on the March 13, 2018 CT scan. [Filing No. 76 at 9.] Plaintiff argues that the Magistrate Judge's ruling on the United States' Motion to Exclude does not preclude Dr. Villa from relying on Dr. Tarver's finding that the mass that Dr. Drocea missed grew considerably in a single month. [Filing No. 76 at 12.]

In its reply, the United States argues that the Disclosure "does not on its face state an opinion regarding negligence," does not state that a mass "clearly should have been seen and reported," and does not state that the radiology services provided by the Danville VA were negligent or fell below the applicable standard of care. [Filing No. 77 at 4.] The United States also points to Dr. Shoucair's deposition testimony, in which he was unable to answer questions

regarding whether Dr. Drocea's treatment fell below the standard of care for a radiologist or whether it constituted negligence.  [Filing No. 77 at 5.]

The Seventh Circuit Court of Appeals has recognized that "[w]hether at least some expert evidence is essential to a claim…may be understood as substantive," and is governed by state law. *Love v. United States*, --- F.4th ----, 2021 WL 5119342, at *2 (7th Cir. Nov. 4, 2021); *see also Murrey v. United States*, 73 F.3d 1448, 1456 (7th Cir. 1996) (Illinois rule requiring expert testimony to establish medical negligence is a substantive rule and is "part of the Illinois law of medical malpractice incorporated into the federal law of [FTCA actions].").  Accordingly, Illinois law applies to the question of whether Plaintiff must present expert evidence to show that the United States acted negligently.

The Illinois Supreme Court has instructed that:

> In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements of a cause of action: the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care…. Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard.

*Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. S. Ct. 1986).

"Generally, expert testimony is required to support a medical malpractice claim because the assessment of the alleged negligence may require knowledge, skill or training in a technical area outside the comprehension of laypersons." *Holzrichter v. Yorath*, 987 N.E.2d 1, 20 (Ill. Ct. App. 2013).  "'Expert testimony is necessary whenever [a factfinder] who [is] not skilled in the practice of medicine would have difficulty, without assistance of medical evidence, in determining any lack of necessary scientific skill on the part of a medical professional.'" *Id.* (quoting *Schindel v. Albany Medical Corp.*, 625 N.E.2d 114, 119 (Ill. Ct. App. 1993)).

It is undisputed that Plaintiff has not proffered an expert who will testify regarding the applicable standard of care for a radiologist in reading Mr. Lyons' CT scan, and whether Dr. Drocea deviated from that standard of care when he failed to identify the mass that was visible on Mr. Lyons' March 13, 2018 CT scan.  Plaintiff relies solely upon the Disclosure in arguing that the Illinois VA admitted Dr. Drocea was negligent.  [*See* Filing No. 76 at 9-10.]  But the notes from the December 19, 2018 meeting between Mr. Lyons and Dr. Shoucair do not reflect an acknowledgment that the standard of care was not met.  [*See* Filing No. 71-6.]  Further, while the Adverse Events Policy hints at admitting wrongdoing, it does not mention the standard of care at all.  Specifically, the Adverse Events Policy includes the following relevant language:

- "VHA believes that there is an unwavering ethical obligation to disclose to patients harmful adverse events that have been sustained in the course of their [VA] care, including cases where the harm may not be obvious, or where there is a potential for harm to occur in the future";

- "Adverse events are untoward incidents, diagnostic or therapeutic misadventures, iatrogenic injuries, or other occurrences of harm or potential harm directly associated with care or services provided within the jurisdiction of the Veterans Healthcare System";

- "'[D]isclosure of adverse events' refers to the forthright and empathetic discussion of clinically-significant facts between providers or other VHA personnel and patients or their personal representatives about the occurrence of a harmful adverse event, or an adverse event that could result in harm in the foreseeable future";

- "Institutional disclosure of adverse events…is a formal process by which facility leaders, together with clinicians and other appropriate individuals, inform the patient or the patient's personal representative that an adverse event has occurred during the patient's care that resulted in or is reasonably expected to result in death or serious injury.  Serious injury may include significant or permanent disability, injury that leads to prolonged hospitalization, injury requiring life-sustaining intervention, or intervention to prevent impairment or damage…"; and

- "Institutional disclosure of adverse events must include: (1) An expression of concern and an apology, including an explanation of the facts to the extent that they are known. (2) An outline of treatment options, if appropriate.  (3)

18

> Arrangements for a second opinion, additional monitoring, expediting clinical consultations, bereavement support, or whatever might be appropriate depending on the circumstances and within the constraints of VA's statutory and regulatory authority.  (4) Contact information regarding designated staff who are to respond to questions regarding the disclosed information or clinical sequelae associated with the adverse event.  (5) Notification that the patient or personal representative has the option of obtaining outside medical or legal advice for further guidance.    (6) Offering information about potential compensation under…the [FTCA]….   <u>There should be no assurance that compensation will be granted, as the adverse event may not give rise to and meet legal criteria for compensation under…the [FTCA]</u>.

[Filing No. 76-4 at 1-5 (emphasis in original).]

There is no reference to a deviation from the standard of care in the Adverse Events Policy and, indeed, the Adverse Events Policy warns that the adverse event may not warrant a finding of liability under the FTCA.  Plaintiff relies on three cases to support his argument that the Disclosure constituted an admission of negligence, but the courts in those cases did not consider whether expert testimony is needed in light of a disclosure of adverse events. *See Heifner v. United States*, 2020 WL 4059186, at *1-2 (N.D. Ind. July 20, 2020) (The court considered whether attaching a disclosure of adverse event to the complaint allowed plaintiff to pursue claims referred to in the disclosure, but that were otherwise time-barred.  The court referred to events in the disclosure as "acts of malpractice," but a reviewing physician had issued a written report finding that the care provider had "failed to meet the standard of care regarding multiple aspects of [plaintiff's] preoperative and operative care."); *Grant v. United States*, 2017 WL 2265956, at *5 (D. S.C. May 24, 2017) (The court considered the implications of a disclosure of adverse events on whether certain claims were time-barred.  The disclosure, unlike in this case, explicitly stated that the provider had not met the standard of care.); *Murrey*, 73 F.3d at 1455-56 (The court found that statements that the VA Secretary made to a patient's widow that "poor care contributed to [the death of the patient]" and that the death was "caused by a medical misadventure" were admissible

as evidence that the provider had not met the standard of care, but not as admissions of liability, and – unlike this case – the patient's widow had also proffered expert testimony on the standard of care.  The court stated "[e]xpert testimony was offered on behalf of the plaintiff, and there is no rule that the expert testimony offered by the plaintiff in a medical malpractice case cannot be supplemented by other evidence.").

Absent expert medical evidence, the factfinder in this case is simply not equipped to determine whether Dr. Drocea deviated from the standard of care when he missed the mass on the March 13, 2018 CT scan.  In short, Plaintiff's reliance on the fact that the Danville VA held a meeting to disclose that an adverse event had occurred as proof that Dr. Drocea deviated from the applicable standard of care is a bridge too far, and the Disclosure did not absolve Plaintiff of the requirement of providing expert evidence on that issue.  Consequently, Plaintiff cannot prove the first two elements of his medical negligence claim – the proper standard of care, and a negligent failure to comply with that standard of care – and the United States' Motion for Summary Judgment, [Filing No. 71], is **GRANTED**.

2.    *Causation*

While Plaintiff's failure to present expert evidence regarding the applicable standard of care and whether Dr. Drocea deviated from that standard is fatal to his negligence claim, the Court also discusses whether Plaintiff has provided sufficient expert evidence on the causation element of his claim.

The United States argues in support of its Motion for Summary Judgment that Dr. Villa testified that Mr. Lyons' condition was incurable and would have inevitably caused his death absent an intervening factor.  [Filing No. 73 at 17.]  The United States asserts that Dr. Villa's testimony undermines Plaintiff's allegation that Mr. Lyons "'was seriously injured in that what was once a

20

treatable but serious medical condition grew and expanded throughout his body and became a fatal condition beyond effective treatment.'" [Filing No. 73 at 17 (quoting Filing No. 52 at 3).]  The United States contends that to the extent Plaintiff's claim survives, the claim is limited by Dr. Villa's testimony that Mr. Lyons suffered a loss of no more than three to seven months of life expectancy as a result of the delay in diagnosis and treatment.  [Filing No. 73 at 17.]  It argues that Dr. Villa admitted that the opinion that Mr. Lyons lost three to seven months is not included in his Expert Report, nor are the medical authorities on which the opinion is based included.  [Filing No. 73 at 17.]  Accordingly, the United States asserts, Plaintiff will not be able to introduce any evidence at trial regarding causation.  [Filing No. 73 at 17-18.]

In his response, Plaintiff argues that he does not need to prove a better than 50% chance of recovery in order to bring a negligence claim for loss of chance, and that "[s]uch a loss of chance is exactly what Dr. Villa's expert medical opinion provides in this case." [Filing No. 76 at 16.]

In its reply, the United States argues that Plaintiff did not dispute its characterization of Dr. Villa's testimony in his response brief, and also that Plaintiff did not argue that Dr. Villa's opinion and supporting authorities regarding Mr. Lyons' alleged reduction in life expectancy were timely and adequately disclosed.  [Filing No. 77 at 2-3.]  The United States argues that Plaintiff's failure to address these arguments constitutes waiver.  [Filing No. 77 at 3.]

Plaintiff did not respond to the United States' arguments regarding a lack of expert evidence on causation, and has therefore waived any opposition to those arguments.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver."); *Laborers' Inter. Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (holding that arguments not presented in response to motion for summary judgment are waived); *De v. City of Chicago*, 912 F.Supp.2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to

develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims.").  Nevertheless, the Court discusses whether the expert evidence Plaintiff has presented is sufficient on the issue of causation.

A "lost chance" or "loss of chance" negligence claim under Illinois law "refers to the injury sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff." *Holton v. Memorial Hosp.*, 679 N.E.2d 1202, 1209 (Ill. S. Ct. 1997).  A medical negligence claim based on "loss of chance" requires proof that "the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery." *Id.*  "Proximate cause must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Williams v. Rockford Health Physicians*, 2021 WL 2425326, at *14 (Ill. Ct. App. June 14, 2021).

In his Expert Report, Dr. Villa provides the following opinion regarding Mr. Lyons' loss at a chance to recover:

> The failure to properly interpret radiologic procedures beginning February 2018 led to a delay in appropriate treatment for approximately 10 months.  During this time the disease progressed, the patient deteriorated clinically and Mr Lyons changed from low risk to high-risk category according to the International Metastatic renal cell carcinoma database consortium criteria….  The median survival of patients with renal cell cancer treated with Pazopanib in multiple studies…is between 24 to 36 months yet Mr. Lyons achieved only an 8 month response and died 17 months later.
>
> In my opinion within reasonable medical probability it is reasonable to assume that had Mr Lyons been diagnosed and treated appropriately February or March 2018 he would have had a longer response to [Pazopanib] or similar tyrosine kinase

inhibitor therapy and would have been in more favorable clinical status later on when immunotherapy (Nivolumab) became the optimal choice for second line treatment.

[Filing No. 71-3 at 1-2.]

Dr. Villa testified in his deposition that Mr. Lyons died of progressive metastatic disease caused by renal cell carcinoma, and that the "metastatic condition" was not curable in 2016 when Mr. Lyons was first diagnosed with cancer, or in 2018 when Mr. Lyons had the CT scan revealing the tumor.  [Filing No. 71-5 at 32-33 ("Q: And so you would agree that unless a different cause of death intervenes, metastases of the type that Mr. Lyons had no later than January 2016 and continuing until May of 2020 ordinarily continue to progress until they cause the patient's death regardless of when they are diagnosed and what form of medical intervention is pursued?  A: That is correct.").  He also testified that he believes that Mr. Lyons would have survived for four to seven more months than he ultimately did, had he started treatment immediately after the March 13, 2018 CT scan.  [Filing No. 71-5 at 27-29.]  Accordingly, Dr. Villa's testimony does not support a claim that Mr. Lyons would have survived had Dr. Drocea identified the tumor on the March 2018 CT scan, but rather is limited to a loss of chance at survival for four to seven months.[3]

As to whether Dr. Drocea missing the tumor on the March 13, 2018 CT scan proximately caused a lost chance of recovery for a four to seven month period, Dr. Villa's Expert Report is somewhat contradictory and vague.  He opines that the median survival of patients with renal cancer who treated with Pazopanib, as Mr. Lyons did, is between 24 to 36 months, and notes that Mr. Lyons "achieved only 8 months response and died 17 months later."  [Filing No. 71-3 at 1.]

---

[3] The United States refers to Dr. Villa's deposition testimony that Mr. Lyons would have lived an additional three to seven months had he been diagnosed in March 2018, [Filing No. 73 at 17], but Dr. Villa testified that Mr. Lyons would have lived an additional four to seven months, [Filing No. 71-5 at 27-28].

The Court notes that these numbers do not match with the timeline in this case.  The first CT scan revealing the tumor was in March 2018, Mr. Lyons did not learn of the tumor until December 2018, and he died in May 2020.  So 17 months passed between learning of the tumor in December 2018 and Mr. Lyons' death in May 2020.  The Court surmises that Dr. Villa meant that Mr. Lyons responded to Pazopanib for 8 months, and died 9 months after he stopped treating with Pazopanib, or 17 months after learning of the tumor – not that he died 17 months after he stopped treating with Pazopanib.  Dr. Villa's Expert Report is, at best, confusing and unclear.

Additionally, Dr. Villa's deposition testimony regarding the four to seven month period is vague.[4]  He testified that Mr. Lyons would have lived four to seven months longer had he been diagnosed immediately after the March 13, 2018 CT scan, but his basis for that opinion is unclear. Dr. Villa referred to articles about Sunitinib, a drug he characterizes as "equivalent in terms of efficacy to [P]azopanib," and to his belief that Mr. Lyons would have survived longer had he started treating immediately with Pazopanib following the March 13, 2018 CT scan, followed by treatment with Nivolumab, another cancer drug.  [Filing No. 71-5 at 28-31.]  But Dr. Villa also acknowledged that 75% to 80% of patients who treat with Nivolumab do not have a response to it, that Mr. Lyons did not respond to Nivolumab, and that his lack of response was "consistent with the substantial majority of patients who are treated with [it]."  [Filing No. 71-5 at 31-32.]  He further acknowledged that: (1) "[i]t's possible for a patient with a tumor burden that Mr. Lyons had in April of 2018 to have been treated timely and still achieve a response and survival period significantly less than the median [survival period]"; and (2) when presented with a patient "who

_____

[4] The United States argues that Dr. Villa's deposition testimony impermissibly goes beyond the scope of his Expert Report, and cannot be used to prove causation.  [Filing No. 73 at 17-18.]  The Court need not consider this issue, as it concludes that Dr. Villa's deposition testimony is not sufficient to show causation in any event.

has the tumor burden that Mr. Lyons had in April of 2018 which is when [Dr. Villa] believe[s] treatment with [P]azopanib should have been initiated, [he] can only speculate what [Mr. Lyons'] response and survival periods would actually be."   [Filing No. 71-5 at 35-36.]  Dr. Villa relied upon his assumptions that had Mr. Lyons been treated in March 2018, "[t]he fact that he has less tumor burden means that it's highly likely that he would have responded longer," and that had he started treating earlier he would have been followed more closely, which would have made it more likely that his treating physician would have "[brought] back other medications earlier in the course of the disease."  [Filing No. 71-5 at 37.]  Dr. Villa admitted that there is not "any article that [he] can point out that proves that," but states that "it's standard belief in the clinical oncology community, and it's also reflected by all the databases…, if you have more advanced disease, you're not going to do as well.  If you have more limited disease, your prognosis is better." [Filing No. 71-5 at 37.]

In short, Dr. Villa relied on his assumption that Mr. Lyons would have lived longer because treating cancer earlier rather than later generally results in a better prognosis.  While this may be true, Dr. Villa did not provide specific opinions, grounded in science, regarding Mr. Lyons' specific cancer, and why he thinks Mr. Lyons would have achieved a survival rate greater than the median survival rate for patients who treat with Pazopanib.  His testimony is simply too speculative to allow a reasonable factfinder to conclude that Mr. Lyons would have survived an additional four to seven months had his recurrence of cancer been diagnosed in March 2018.  Mr. Lyons lived for 26 months after the March 13, 2018 CT scan, which is within the median range for survival if he had started treating immediately with Pazopanib.  There simply is no evidence in Dr. Villa's Expert Report or his deposition testimony from which a reasonable factfinder could conclude that Dr. Drocea's failure to identify the tumor in March 2018 proximately caused Mr. Lyons to lose a

chance at recovery for a four to seven month time period, providing another basis for the Court to

**GRANT** the United States' Motion for Summary Judgment.  [Filing No. 71.]

### IV.
#### CONCLUSION

The circumstances underlying this case are tragic and unfortunate, and the Court sympathizes with Mr. Lyons' family and recognizes the fact that the Court's decision may seem unfair.  However, Plaintiff has not presented evidence – which Illinois law requires must come from an expert – from which a reasonable factfinder could conclude that the Danville VA's negligence caused Mr. Lyons' untimely death.   While the Danville VA admitted that Dr. Drocea missed identifying the tumor on the March 13, 2018 CT scan, this does not legally equate to an admission or showing that Dr. Drocea deviated from the applicable standard of care. And while Dr. Villa opined at his deposition that Mr. Lyons would have survived for four to seven additional months had he started treatment immediately after the March 13, 2018 CT scan, his opinion is speculative at best. For the foregoing reasons, the Court **GRANTS** the United States' Motion for Summary Judgment, [71].  Final judgment shall enter accordingly.


Date: 11/17/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record**

26